IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| C. NICOLE HENDERSON, et al., | : | CIVIL ACTION |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | NO. 19-1064 |
| | : | |
| MONTGOMERY COUNTY COMMUNITY | : | |
| COLLEGE, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

Plaintiffs Mychelle Sneed-Jacobs ("Sneed-Jacobs"), Natasha Patterson ("Patterson"), and C. Nicole Henderson ("Henderson") (collectively, "Plaintiffs"), assert claims for race discrimination in violation of 42 U.S.C. § 1981, as amended by the Civil Rights Act of 1991 ("§ 1981"), Title VII of the Civil Rights Act of 1964 ("Title VII"), and the Pennsylvania Human Relations Act ("PHRA"), against their former employer, Defendant Montgomery County Community College ("MC3").  MC3 filed three Motions for Summary Judgment on all claims asserted by Plaintiffs Sneed-Jacobs, Patterson, and Henderson.[1]  Doc. Nos. 29, 30, 32.  For the reasons that follow, MC3's Motions will be granted in their entirety.

## I.  BACKGROUND

Although the Plaintiffs shared the same employer, their allegations of discrimination are factually unique.  Therefore, the facts underlying the claims of each Plaintiff are set forth, individually, below.

---

[1]  Upon consent of the parties and by order of the Honorable Karen S. Marston, the case was referred to the undersigned to conduct all further proceedings, including trial, the entry of final

(Footnote continued on next page)

### A.    <u>Sneed-Jacobs</u>

Sneed-Jacobs is an African American who was employed by MC3 for approximately four months, from October 9, 2017 through February 23, 2018.  Def.'s Statement of Undisputed Material Facts in Supp. of its Mot. for Summ. J. Against Sneed-Jacobs (Doc. No. 29-3) ¶¶ 1, 3 [hereinafter "Def.'s Sneed-Jacobs Facts"]; Sneed-Jacobs' Counter Statement to Def.'s Statement of Undisputed Material Facts (Doc. No. 34-3) ¶¶ 1, 3 [hereinafter "Sneed-Jacobs' Facts"]. Sneed-Jacobs was hired by MC3 as the Assistant Vice President of Academic Affairs beginning on October 9, 2017.  Def.'s Sneed-Jacobs Facts ¶¶ 3-4; Sneed-Jacobs' Facts ¶¶ 3-4.  Victoria Bastecki-Perez ("Bastecki-Perez"), the Vice President of Academic Affairs and Provost, approved the decision to hire Sneed-Jacobs, as she was deemed to be the most qualified candidate for the position.  Def.'s Sneed-Jacobs Facts ¶¶ 4, 6-7; Sneed-Jacobs' Facts ¶¶ 4, 6-7. As Assistant Vice President of Academic Affairs, Sneed-Jacobs reported to Bastecki-Perez. Def.'s Sneed-Jacobs Facts ¶ 10; Sneed-Jacobs' Facts ¶ 10.  Her duties included providing strategic leadership and management support to the Office of Academic Affairs relating to faculty and professional development and student access, retention, and completion.  Def.'s Sneed-Jacobs Facts ¶ 11; Sneed-Jacobs' Facts ¶ 11.  In addition, Sneed-Jacobs was responsible for planning and implementing faculty orientation and development activities.  Def.'s Sneed-Jacobs Facts ¶ 12; Sneed-Jacobs' Facts ¶ 12.

One of Sneed-Jacobs' job duties included handling grade appeals made by students. Def.'s Sneed-Jacobs Facts ¶ 19; Sneed-Jacobs' Facts ¶ 19.  During her tenure, she was questioned by faculty for allegedly not properly following procedures regarding the timeline of

---

judgment, and all post-trial proceedings.  Doc. No. 15.

the grade-appeal process for students as outlined in MC3's grade-appeal policies.  Def.'s Sneed-Jacobs Facts ¶ 19; Sneed-Jacobs' Facts ¶ 19.  Hal Halbert ("Halbert"), a tenured faculty member at MC3 and the President of the MC3 Faculty Federation, AFT, American Federation of Teachers Local No. 4272, attended grade-appeal hearings while Sneed-Jacobs was employed by MC3.  Def.'s Sneed-Jacobs Facts ¶ 21; Sneed-Jacobs' Facts ¶ 21.

Sneed-Jacobs also planned a Faculty Development Day, a required event for all full-time faculty, that occurred in January 2018.  Def.'s Sneed-Jacobs Facts ¶¶ 22-23; Sneed-Jacobs' Facts ¶¶ 22-23.  Although she disputes whether planning that event was part of her job responsibilities when hired, Sneed-Jacobs was instructed to plan the event.  Def.'s Sneed-Jacobs Facts ¶¶ 22-36; Sneed-Jacobs' Facts ¶¶ 22-36.  The faculty surveys submitted after the conclusion of the event, which were routinely done, included negative feedback.  Def.'s Sneed-Jacobs Facts ¶ 25; Sneed-Jacobs' Facts ¶¶ 22-36.  Some of the negative comments related to the lack of breakfast provided at the event, which Sneed-Jacobs claims was the result of Bastecki-Perez's denial of her request.  Sneed-Jacobs' Facts ¶¶ 22-36.  Other complaints related to the presence of the college President, who Sneed-Jacobs alleges she advised had 45 minutes to speak, but instead spoke for only approximately 15 minutes and then left the venue early without engaging with faculty.  Def.'s Sneed-Jacobs Facts ¶ 28; Sneed-Jacobs' Facts ¶¶ 22-36.  Negative feedback was also provided from coordinators who indicated through their survey responses that they were not provided adequate time to prepare for their role in facilitating the meetings during the day.  Def.'s Sneed-Jacobs Facts ¶ 26; Sneed-Jacobs' Facts ¶¶ 22-36.  Sneed-Jacobs also organized the participation of a board game with faculty during the day, but the game had a low number of faculty engagement.  Def.'s Sneed-Jacobs Facts ¶¶ 35-36; Sneed-Jacobs' Facts ¶¶ 22-36.

3

Subsequently, on February 17, 2018, Sneed-Jacobs' daughter competed in a cheerleading competition in Atlanta, Georgia, which she learned of in January 2018.  Def.'s Sneed-Jacobs Facts ¶¶ 43, 45; Sneed-Jacobs' Facts ¶¶ 43, 45.  On the morning of Thursday, February 15, 2018, Sneed-Jacobs emailed Bastecki-Perez requesting to work from home and advising her that she would be leaving for the competition later that day.  Def.'s Sneed-Jacobs Facts ¶ 46; Sneed-Jacobs' Facts ¶ 46.  Sneed-Jacobs failed to request prior approval to be away from campus on February 15, 2018.  Def.'s Sneed-Jacobs Facts ¶ 48; Sneed-Jacobs' Facts ¶ 48.  Bastecki-Perez informed Sneed-Jacobs that she wished that this request to work from home had been discussed in person as there were students who would be dropping into the office that day who needed assistance and other duties that required in-person attention.  Def.'s Sneed-Jacobs Facts ¶ 49; Sneed-Jacobs' Facts ¶ 49.

On February 20, 2018, Sneed-Jacobs emailed Bastecki-Perez's assistant that she would be away from the office on February 22 and 23, 2018, at the Pennsylvania Black Conference on Higher Education.  Def.'s Sneed-Jacobs Facts ¶ 52; Sneed-Jacobs' Facts ¶ 52.  The assistant forwarded the email to Bastecki-Perez, who was not copied on the original email.  Def.'s Sneed-Jacobs Facts ¶ 52; Sneed-Jacobs' Facts ¶ 52.  The following day, Bastecki-Perez emailed Sneed-Jacobs directing that all requests, whether for vacation or any type of conferences, must be made in advance to Bastecki-Perez for consideration, and that all conference requests must be submitted to her prior to registration for review.  Def.'s Sneed-Jacobs Facts ¶ 53; Sneed-Jacobs' Facts ¶ 53.  Sneed-Jacobs attended the Pennsylvania Black Conference on Higher Education on February 22 and 23, 2018, but Bastecki-Perez requested her to return to campus.  Def.'s Sneed-Jacobs Facts ¶¶ 54-55; Sneed-Jacobs' Facts ¶¶ 54-55.

On February 23, 2018, upon Sneed-Jacobs' return to campus, Bastecki-Perez met with Sneed-Jacobs and terminated her employment.  Def.'s Sneed-Jacobs Facts ¶ 55.  She was subsequently replaced by someone who was white.  Pls.' Mem. of Law in Opp. to Def.'s Mot. for Summ. J. (Doc. No. 34) at 23 [hereinafter "Pls.' Br."]; Bastecki-Perez Dep. (Doc. No. 37-15) at 95.  Sneed-Jacobs never made a complaint of discrimination on the basis of race while she was employed at MC3.  Def.'s Sneed-Jacobs Facts ¶ 63; Sneed-Jacobs' Facts ¶ 63.[2]

### B. **Patterson**

Patterson, an African American, was initially hired by MC3 in 2014 as a Diversity Fellow.  Def.'s Statement of Undisputed Material Facts in Supp. of its Mot. for Summ. J. Against Patterson (Doc. No. 30-3) ¶¶ 8, 10 [hereinafter "Def.'s Patterson Facts"]; Patterson's Counter Statement to Def.'s Statement of Undisputed Material Facts (Doc. No. 34-2) ¶¶ 8, 10 [hereinafter "Patterson's Facts"].  Patterson then continued at MC3 as an Assistant Professor of Public Health from August 2015 through June 25, 2017.  Def.'s Patterson Facts ¶ 12; Patterson's Facts ¶ 12.  In June 2016, Patterson applied for the position of Dean of Health Sciences.  Def.'s Patterson Facts ¶ 14; Patterson's Facts ¶ 14.  Patterson and another applicant, Marion Gillard ("Gillard"), advanced in the search-selection process.  Def.'s Patterson Facts ¶ 15; Patterson's Facts ¶ 15. Gillard, who is white, was eventually selected for the Dean of Health Sciences position over Patterson.  Def.'s Patterson Facts ¶¶ 17-18, 24; Patterson's Facts ¶¶ 17-18, 24.  Although not

---

[2]     Sneed-Jacobs responds to MC3's statement that "Sneed-Jacobs never made a complaint of discrimination on the basis of race while she was employed at MC3" by stating: "Disputed.  This is not a material fact."  Def.'s Sneed-Jacobs Facts ¶ 63; Sneed-Jacobs' Facts ¶ 63; see also Def.'s Sneed-Jacobs Facts ¶¶ 48-49; Sneed-Jacobs' Facts ¶¶ 48-49.   Where there is a factual contention with evidentiary support and the opposing party denies that contention without citing any record-based evidence, a court considers it admitted.  See, e.g., Acclaim Sys., Inc. v. Infosys, Ltd., No. 13-7336, 2016 WL 974136, at *1 n.1 (E.D. Pa. Mar. 14, 2016).

selected as Dean of Health Sciences, Patterson was reappointed to the faculty for the 2016-2017 academic year.  Def.'s Patterson Facts ¶ 21; Patterson's Facts ¶ 21.

Gillard was subsequently removed from the Dean of Health Sciences position on account of her poor performance.  Def.'s Patterson Facts ¶¶ 22-23; Patterson's Facts ¶¶ 22-23.  Patterson was then appointed as Interim Dean of Health Sciences from approximately June 26, 2017 through December 31, 2017.  Def.'s Patterson Facts ¶ 25; Patterson's Facts ¶ 25.  Her interim appointment was later extended until June 30, 2018, based upon the recommendation of Bastecki-Perez.  Def.'s Patterson Facts ¶¶ 26-27; Patterson's Facts ¶¶ 26-27.  In February 2018, during the time she was serving as Interim Dean, Patterson again submitted an application for the permanent position of Dean of Health Sciences.  Def.'s Patterson Facts ¶ 30; Patterson's Facts ¶ 30.  MC3 ultimately hired Gloria Oikelome ("Oikelome"), who is Black or African American, for the position in July 2018.  Def.'s Patterson Facts ¶¶ 31, 33; Patterson's Facts ¶¶ 31, 33.  Patterson's last day as Interim Dean was on June 30, 2018.  Def.'s Patterson Facts ¶ 29; Patterson's Facts ¶ 29.  At the conclusion of her interim deanship, Patterson had the option of continuing on as a public health assistant professor and was issued a faculty reappointment notice on August 3, 2018.  Def.'s Patterson Facts ¶¶ 35-36; Patterson's Facts ¶¶ 35-36.  On August 8, 2018, however, she submitted her resignation to MC3.  Def.'s Patterson Facts ¶ 39; Patterson's Facts ¶ 39.

### C.   Henderson

Henderson, an African American, was the former Dean of Student Affairs at MC3. Def.'s Statement of Undisputed Material Facts in Supp. of its Mot. for Summ. J. Against Henderson (Doc. No. 32-3) ¶ 2 [hereinafter "Def.'s Henderson Facts"]; Henderson's Counter Statement to Def.'s Statement of Undisputed Material Facts (Doc. No. 34-1) ¶ 2 [hereinafter

"Henderson's Facts"].  Henderson first served as MC3's Director of the Upward Bound Partnership for Student Success Program from March 2008 through July 2012.  Def.'s Henderson Facts ¶ 5; Henderson's Facts ¶ 5.  From August 2012 through October 2015, she served as MC3's Testing Services Director.  Def.'s Henderson Facts ¶ 7; Henderson's Facts ¶ 7. Henderson became MC3's Dean of Student Affairs on October 19, 2015, a position for which she was recommended by Philip Needles ("Needles"), the Vice President of Student Services. Def.'s Henderson Facts ¶¶ 9, 11-12; Henderson's Facts ¶¶ 9, 11-12.  Throughout her employment at MC3, every search in which Henderson participated as a candidate resulted in her securing the position.  Def.'s Henderson Facts ¶ 6; Henderson's Facts ¶ 6.

MC3 maintains a policy governing family and medical leave pursuant to the Family and Medical Leave Act ("FMLA"), as well as a policy governing administrative leave for full-time administrators.  Def.'s Henderson Facts ¶¶ 21-22; Henderson's Facts ¶¶ 21-22.  Pursuant to MC3's policy governing administrative leave for full-time administrators, sick leave runs concurrently with family and medical leave.  Def.'s Henderson Facts ¶ 24; Henderson's Facts ¶ 24.  Henderson, however, claims that Diane O'Connor ("O'Connor"), Director of Human Resources, informed her that MC3 provided unlimited medical leave for administrators. Henderson's Facts ¶ 25.  However, MC3's policy governing administrative leave does not contain a provision granting unlimited medical leave for administrators, O'Connor Dep. Ex. 8 (attached to Def.'s Henderson Facts at Doc. No. 31-4), nor has Henderson identified any administrator who had been granted unlimited medical leave, Def.'s Henderson Facts ¶ 26; Henderson's Facts ¶ 26.

During her employment at MC3, Henderson requested and was granted leave multiple times.  In February 2018, Henderson went on paid disability leave.  Def.'s Henderson Facts ¶ 28;

Henderson's Facts ¶ 28.  The initial request for leave was from February 9, 2018 through March 8, 2018.  Def.'s Henderson Facts ¶ 29; Henderson's Facts ¶ 29.  On March 28, 2018, Henderson's healthcare provider informed her that she could return to work commencing on April 2, 2018, with a reduced schedule through June 2, 2018.  Def.'s Henderson Facts ¶ 31; Henderson's Facts ¶ 31.  Henderson returned to full-time work on June 7, 2018.  Def.'s Henderson Facts ¶ 36; Henderson's Facts ¶ 36.  Although Henderson and O'Connor exchanged multiple emails regarding calculating her pay while on leave, see Henderson's Facts ¶¶ 33-35, Henderson did receive her full pay for the medical leave during the spring of 2018 as well as the correct pay for the hours she worked on reduced leave.  Def.'s Henderson Facts ¶¶ 35, 37; Henderson's Facts ¶¶ 35, 37.

Henderson also used family and medical leave in 2019 and 2020.  Def.'s Henderson Facts ¶ 40; Henderson's Facts ¶ 40.  Henderson requested and was granted leave from work from July 12, 2019 through October 3, 2019.  Def.'s Henderson Facts ¶ 44; Henderson's Facts ¶ 44.  She returned to work on September 3, 2019, after she had exhausted her vacation leave.  Def.'s Henderson Facts ¶ 45; Henderson's Facts ¶ 45.  In September 2019, Henderson submitted a note from a healthcare provider requesting leave from September 4, 2019 through October 3, 2019.  Def.'s Henderson Facts ¶ 46; Henderson's Facts ¶ 46.  On September 10, 2019, O'Connor sent information to Henderson concerning the ability to take leave under the FMLA.  Def.'s Henderson Facts ¶ 47; Henderson's Facts ¶ 47.  Henderson was granted FMLA leave until October 9, 2019, when her FMLA leave was exhausted.  Def.'s Henderson Facts ¶ 48; Henderson's Facts ¶ 48.  Henderson then requested an extension of medical leave using paid sick leave from October 14, 2019 through November 17, 2019.  Def.'s Henderson Facts ¶ 49; Henderson's Facts ¶ 49.  MC3 granted this request through November 10, 2019, when

Henderson's paid sick leave would be exhausted.  Def.'s Henderson Facts ¶ 50; Henderson's

Facts ¶ 50.  In November 2019, Henderson asked for additional paid leave, in response to which

she was advised that she had the option of using vacation days or having her pay reduced to 60

percent.  Def.'s Henderson Facts ¶¶ 51-52; Henderson's Facts ¶¶ 51-52.  Following a meeting on

November 25, 2019, O'Connor sent Henderson a letter which, among other items, provided

additional leave options for Henderson's consideration, including short-term disability and

special leave.  Def.'s Henderson Facts ¶ 53; Henderson's Facts ¶ 53.  On December 17, 2019,

Henderson asked for leave to care for her daughter, which was granted.  Def.'s Henderson Facts

¶ 54; Henderson's Facts ¶ 54.  Following a request for additional medical leave from January 9,

2020 through February 9, 2020, O'Connor sent a letter to Henderson advising that

documentation was necessary from a healthcare provider and asking that the information be

provided by January 30, 2020.  Def.'s Henderson Facts ¶ 55; Henderson's Facts ¶ 55.

By this time, Henderson had exhausted her 12 weeks of leave under the FMLA.  Def.'s

Henderson Facts ¶ 56; Henderson's Facts ¶ 56.  O'Connor once again sent a letter to Henderson

on February 3, 2020, confirming that Henderson was not seeking an accommodation under the

Americans with Disabilities Act and requesting that the use of paid sick leave needed to be

supported by documentation from a healthcare provider.  Def.'s Henderson Facts ¶ 58;

Henderson's Facts ¶ 58.  On February 17, 2020, Henderson provided a letter from a healthcare

provider regarding her inability to work, followed by additional documentation that she could

return to work without restrictions on March 10, 2020.  Def.'s Henderson Facts ¶¶ 61-62;

Henderson's Facts ¶¶ 61-62.  By February 2020, Henderson had utilized her full complement of

450 hours of family and medical leave as calculated from July 2019.  Def.'s Henderson Facts

¶ 63; Henderson's Facts ¶ 63.

While at MC3, Henderson had a contentious relationship with her colleague, Halbert. Def.'s Henderson Facts ¶ 64; Henderson's Facts ¶ 64. On August 20, 2018, Henderson and Halbert exchanged emails pertaining to a disagreement over whether Halbert was required to copy Henderson on an email regarding a faculty issue. Def.'s Henderson Facts ¶ 67; Halbert Dep. Ex. 6 (attached to Def.'s Henderson Facts at Doc. No. 31-4). Henderson accused Halbert of using an "aggressive and bullying tone" in his email to her. Halbert Dep. Ex. 6. In response to this accusation, Halbert sought an investigation and an apology from Henderson. Id. That same day, Henderson submitted a complaint of discrimination to O'Connor, who assigned Rose Makofske ("Makofske"), MC3's Director of Equity, Diversity and Inclusion/Title IX Coordinator, to investigate. Def.'s Henderson Facts ¶¶ 4, 69-70; Henderson's Facts ¶¶ 4, 69-70; O'Connor Dep. Ex. 4 (attached to Def.'s Henderson Facts at Doc. No. 31-4). Following the email exchange between Henderson and Halbert, a meeting was held on September 21, 2018 with Henderson, Halbert, Bastecki-Perez, Makofske, Needles, and Halbert's union representative. Henderson's Facts ¶ 71. At this meeting, Halbert referenced the term "quota hire" in connection with Henderson. Def.'s Henderson Facts ¶ 71; Henderson's Facts ¶ 71. The parties dispute whether anyone met with Halbert subsequent to this meeting to discuss his use of the term "quota hire." Def.'s Henderson Facts ¶ 75; Henderson's Facts ¶ 75. A memorandum with the subject line "Conflict over E-mail Exchange" was later issued on October 5, 2018 to Henderson and Halbert from Bastecki-Perez, O'Connor, Needles, and Makofske, who included guidelines for professional interactions moving forward. O'Connor Dep. Ex. 5 (attached to Def.'s Henderson Facts at Doc. No. 31-4). Thereafter, on October 30, 2018, Makofske issued a memorandum to Henderson regarding her August 20, 2018 discrimination complaint, in which she concluded that "the facts as stated by [Henderson] do not rise to the level of discrimination

and the creation of a hostile work environment."  O'Connor Dep. Ex. 7 (attached to Def.'s

Henderson Facts at Doc. No. 31-4).

On July 16, 2020, Henderson resigned from MC3, with her last day of work to occur on

July 31, 2010.  Pls.' Ex. 18 in Opp. to Def.'s Mot. for Summ. J. (Doc. No. 37-18).

## II.   **LEGAL STANDARD**

Under the well-established summary judgment standard, "[t]he court shall grant summary

judgment if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Summary judgment

is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on

file, together with the affidavits, if any, show that there is no genuine issue as to any material fact

and that the moving party is entitled to judgment as a matter of law.'"  Wright v. Owens

Corning, 679 F.3d 101, 105 (3d Cir. 2012) (quoting Orsatti v. New Jersey State Police, 71 F.3d

480, 482 (3d Cir. 1995)).

> [T]he plain language of Rule 56[a] mandates the entry of summary
> judgment, after adequate time for discovery and upon motion, against a
> party who fails to make a showing sufficient to establish the existence of
> an element essential to that party's case, and on which that party will bear
> the burden of proof at trial.  In such a situation, there can be "no genuine
> issue as to any material fact," since a complete failure of proof concerning
> an essential element of the nonmoving party's case necessarily renders all
> other facts immaterial.  The moving party is "entitled to judgment as a
> matter of law" because the nonmoving party has failed to make a
> sufficient showing on an essential element of [his or] her case with respect
> to which [he or] she has the burden of proof.

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

"By its very terms, this standard [that there be no genuine issue as to any material fact]

provides that the mere existence of *some* alleged factual dispute between the parties will not

defeat an otherwise properly supported motion for summary judgment; the requirement is that

there be no *genuine* issue of *material* fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-

48 (1986) (emphasis in original).  A material fact is one that "might affect the outcome of the suit under the governing law."  Id. at 248.

When ruling on a motion for summary judgment, the court shall consider facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ., 470 F.3d 535, 538 (3d Cir. 2006).  To prevail on summary judgment, however, "the non-moving party must present more than a mere scintilla of evidence; there must be evidence on which the jury could reasonably find for the [non-moving party]."  Burton v. Teleflex Inc., 707 F.3d 417, 425 (3d Cir. 2013) (internal quotation marks omitted); see also Anderson, 477 U.S. at 252.

## III.   DISCUSSION

### A.   Plaintiffs Fail to Meet Their Burden to Survive Summary Judgment on Their § 1981, Title VII, and PHRA Claims of Discrimination

Plaintiffs each bring claims of racial discrimination pursuant to § 1981, Title VII, and the PHRA.  Because these claims are analyzed under similar legal frameworks, they will be considered together as appropriate.  See, e.g., Brown v. J. Kaz, Inc., 581 F.3d 175, 181-82 (3d Cir. 2009) ("[T]he substantive elements of a claim under section 1981 are generally identical to the elements of an employment discrimination claim under Title VII"); Atkinson v. LaFayette Coll., 460 F.3d 447, 464 n.6 (3d Cir. 2006) ("Claims under the PHRA are interpreted coextensively with Title VII claims.").

In an employment discrimination case where no direct evidence of intentional discrimination is present, as is the case here, this Court must apply the burden shifting test established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under this framework, the plaintiff has the initial burden of establishing a prima facie case of racial discrimination by pointing to evidence in the record sufficient to create a genuine factual

dispute that "s/he suffered an adverse employment action . . . under circumstances that could give rise to an inference of intentional discrimination" on the basis of race.  Makky v. Chertoff, 541 F.3d 205, 214 (3d Cir. 2008).  To show a prima facie case of racial discrimination, a plaintiff must demonstrate that: "(1) the plaintiff is a member of a protected class; (2) the plaintiff was qualified for the position that he [or she] sought to retain; (3) the plaintiff suffered an adverse employment action, . . . and (4) the adverse employment action occurred under circumstances that could give rise to an inference of intentional discrimination."  Green v. V.I. Water & Power Auth., 557 F. App'x 189, 195 (3d Cir. 2014).  To establish the fourth element, a plaintiff may either: "(1) introduce evidence of comparators (i.e., similarly situated employees who (a) were not members of the same protected class and (b) were treated more favorably under similar circumstances); or (2) rely on circumstantial evidence that otherwise shows a causal nexus between his [or her] membership in a protected class and the adverse employment action."  Id. A plaintiff's subjective belief that race played a role in an employment decision is not, alone, sufficient to establish an inference of discrimination.  Wilson v. Blockbuster, Inc., 571 F. Supp. 2d 641, 647 (E.D. Pa. 2008) (citing Jones v. United Parcel Serv., 214 F.3d 402, 407 (3d Cir. 2000)).

    If a plaintiff makes out a prima facie case, the burden shifts to the defendant employer to provide a legitimate, nondiscriminatory reason for its employment decision.  McDonnell Douglas, 411 U.S. at 802-03.  If the employer meets its burden of articulating a legitimate, nondiscriminatory reason for the adverse employment action, the burden shifts back to the plaintiff to demonstrate that the employer's proffered reason for the adverse employment action was pretextual.  Id.  To establish pretext under the summary judgment standard, a plaintiff must either: (1) offer evidence that "casts sufficient doubt upon each of the legitimate reasons

proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication;" or (2) present evidence sufficient to support an inference that "discrimination was more likely than not a motivating or determinative cause of the adverse employment action." Fuentes v. Perskie, 32 F.3d 759, 762 (3d Cir. 1994).  To meet that burden, a plaintiff must "present evidence contradicting the core facts put forth by the employer as the legitimate reason for its decision."  Kautz v. Met-Pro Corp., 412 F.3d 463, 467 (3d Cir. 2005).  The plaintiff must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence.'"  Fuentes, 32 F.3d at 765 (emphasis in original) (quoting Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 531 (3d Cir. 1992)).  The plaintiff must do more than show that the defendant's proffered reasons were wrong or mistaken; the plaintiff must demonstrate that the defendant acted with discriminatory animus.  Abramson v. William Paterson Coll. of N.J., 260 F.3d 265, 283 (3d Cir. 2001).

     1.    **Sneed-Jacobs**

Sneed-Jacobs, who was terminated in February 2018 after approximately four months as Assistant Vice President of Academic Affairs, asserts that her race played a factor in her termination from MC3.  Pls.' Second Am. Compl. (Doc. No. 20) ¶¶ 31-36.  MC3 concedes, for the purposes of summary judgment, that Sneed-Jacobs satisfies the first three elements to establish a prima facie case: (1) that she was a member of a protected class; (2) that she was qualified for her position as Assistant Vice President of Academic Affairs; and (3) that she suffered an adverse employment decision when she was terminated from this position.  Def.'s Br. in Support of Mot. for Summ. J. Against Sneed-Jacobs (Doc. No. 29-2) at 10 [hereinafter "Def.'s Sneed-Jacobs Br."].  However, MC3 argues that she cannot show that the circumstances

of her termination imply discrimination and that she was terminated because of her consistently poor job performance and failure to satisfy the objectives of her position.  Id. at 10-12.

To establish an inference of discrimination, a plaintiff must produce "evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion."  Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 355 (3d Cir. 1999) (alterations in original) (internal quotation marks omitted).  Here, Sneed-Jacobs argues, in part, that after her termination, she was replaced by Jenna Klaus-Meehan, who is white.  Pls.' Br. at 22-23.  In the Third Circuit, the fact that a plaintiff was replaced by an individual who is not a member of his or her protected class is sufficient to establish an inference of discrimination.  See Johnson v. Keebler-Sunshine Biscuits, Inc., 214 F. App'x 239, 242 (3d Cir. 2007) ("While this Court no longer requires a plaintiff to show that he [or she] was replaced by someone outside of the protected class to establish an inference of discrimination, we find that this evidence establishes the fourth and final element of a prima facie case"); Jones v. Sch. Dist. of Phila., 19 F. Supp. 2d 414, 418 (E.D. Pa. 1998) (an inference of discrimination may be made where "the [plaintiff's] position is ultimately filled by a person not of the protected class").  Accordingly, Sneed-Jacobs has met her burden, which is "'not onerous,'" of establishing a prima facie case of race discrimination.  Anderson v. Wachovia Mortg. Corp., 621 F.3d 261, 271 (3d Cir. 2010) (quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981)).

MC3 contends, however, that Sneed-Jacobs was terminated for poor performance and lack of dedication to her role as Assistant Vice President of Academic Affairs.  Def.'s Sneed-Jacobs Br. at 10-12.  Bastecki-Perez, who made the decision to terminate Sneed-Jacobs, testified that she failed to satisfactorily fulfill various job responsibilities, including failing to implement an open dialogue and transparency with respect to the grade-appeals process, failing to

successfully execute the Faculty Development Day, failing to demonstrate personal responsibility towards her job duties, and ultimately failing to receive prior approval from Bastecki-Perez for two absences from work, one involving attending a cheerleading competition for her daughter and the other involving her attendance at a professional conference.  Bastecki-Perez Dep. at 146-53; Def.'s Sneed-Jacobs Br. at 11-12.  Sneed-Jacobs was instructed to run the Faculty Development Day, which Bastecki-Perez considered was poorly executed.  Bastecki-Perez Dep. at 146-49.  According to Bastecki-Perez, the faculty surveys submitted at the conclusion of the event contained negative reviews of the program and indicated that it was "if not the poorest programming that had occurred, it was one of the lowest level of programming that [MC3] had [had] in recent history."  Id. at 147.  Moreover, Bastecki-Perez testified that Sneed-Jacobs was overseeing grade appeals, but her failure to share certain documentation with the faculty resulted in a "difficult" grade-appeals process.  Id. at 149-50.  Sneed-Jacobs' attendance at work was also identified as a factor in her termination; specifically her request the morning of February 15, 2018 to work from home that day to enable her to attend her daughter's cheerleading competition, which she had learned about a month prior, see id. at 152, as well as her attendance at a professional conference which Bastecki-Perez believed she had not previously approved, id. at 67-68, 85-86.  Based on these factors, Bastecki-Perez made the decision to terminate her employment.  Id. at 85-86, 147-55.  This evidence permits the conclusion that MC3 had nondiscriminatory reasons for terminating Sneed-Jacobs' employment.  MC3, therefore, has satisfied its "relatively light" burden of production.  See Fuentes, 32 F.3d at 763.

Here, Sneed-Jacobs fails to demonstrate that there is a genuine issue regarding whether MC3's articulated legitimate reasons for terminating her employment were pretextual.  To

overcome MC3's stated reasons for its decision to terminate her employment, Sneed-Jacobs must

present evidence that could either lead a reasonable factfinder to: (1) disbelieve MC3's

articulated legitimate reasons for terminating her; or (2) believe that an invidious discriminatory

reason was more likely than not a motivating or determinative cause of MC3's actions.  Id. at

764.  It is not enough that the employer's decision was wrong or mistaken; rather, a plaintiff

must demonstrate that "the employer's articulated reason was . . . so plainly wrong that it cannot

have been the employer's real reason."  Jones v. Sch. Dist. of Phila., 198 F.3d 403, 413 (3d Cir.

1999) (internal quotation marks omitted).  In an effort to demonstrate pretext, Sneed-Jacobs

argues that there is a significant fundamental dispute regarding her performance.  Pls.' Br. at 41.

     With respect to Bastecki-Perez's opinion that Sneed-Jacobs failed to successfully

implement Faculty Development Day, Sneed-Jacobs asserts that she was "set up to fail" in her

planning of the day.  Sneed-Jacobs' Facts ¶¶ 22-36; Pls.' Br. at 19-20; Sneed-Jacobs Dep. (Doc.

No. 39) at 125.  As an initial matter, although Sneed-Jacobs disputes whether implementing the

Faculty Development Day was one of her job responsibilities when she was hired, she does not

dispute that she was, in fact, ultimately instructed to plan and coordinate the event.  Sneed-

Jacobs' Facts ¶¶ 22-36.  Nor does she dispute that she received negative feedback in the faculty

surveys as a result of a poorly planned Faculty Development Day.  Id.  For example, faculty

survey responses criticized that coordinators were not provided adequate notice for them to

prepare to host productive meetings with their faculty, noted that there was not enough time and

substance with MC3's President, and indicated that a faculty board game activity only had very

limited participation.  Id.  An employer may use these "'statements and complaints by co-

workers when making a decision to terminate an employee,'" and "'the employee cannot later

establish pretext by simply challenging the veracity of such statements.'"  McNeil v. Greyhound

Lines, Inc., 69 F. Supp. 3d 513, 524 (E.D. Pa. 2014) (quoting McCormick v. Allegheny Valley

Sch., No. 06-3332, 2008 WL 355617, at *16 (E.D. Pa. Feb. 6, 2008)).  "'So long as the decision-

maker reasonably credited the allegations, an employee's denial is not enough to establish

pretext.'"  Id. (quoting McCormick, 2008 WL 355617, at *16).

 Rather than dispute Faculty Development Day's lack of success, however, Sneed-Jacobs

offers a variety of circumstances that she maintains diminish her responsibility for the program's

low ratings.  See Sneed-Jacobs' Facts ¶¶ 22-36; Pls.' Br. at 19-20.  According to Sneed-Jacobs,

her request for breakfast was denied by Bastecki-Perez, and only coffee and tea were approved

instead, which would disappoint the faculty.  Sneed-Jacobs' Facts ¶¶ 22-36.  She was provided

no assistance in finding a spokesperson to speak about benefits.  Id.  Sneed-Jacobs also claims

that, although Bastecki-Perez approved a game for the faculty, Bastecki-Perez should not have

approved a game that did not attract participation among the faculty because Bastecki-Perez

purportedly "had a much better understanding of what would work" whereas Sneed-Jacobs was

"new."  Pls.' Br. at 37.  As a result, Sneed-Jacobs argues that she unfairly "bore the brunt of the

faculty's criticism."  Id.  However, even crediting the lack of assistance she received in planning

the event, Sneed-Jacobs has offered no evidence to suggest that this lack of support was

deliberate or a result of racial bias.  While Sneed-Jacobs deflects responsibility for the program's

lack of success, she does not dispute that she was instructed to implement the program and that

the faculty survey responses indicated that the day was poorly run.  These explanations for why

the Faculty Development Day was not well received do not undermine Bastecki-Perez's

assessment that Sneed-Jacobs failed to effectively implement a program she was tasked with

managing.

Sneed-Jacobs contends that the presence of the faculty union representative, Halbert, at two grade-appeals hearings is likewise evidence of discriminatory pretext. Pls.' Br. at 17-19. Specifically, although Sneed-Jacobs acknowledged that faculty members have the right to have a union representative present at a grade-appeals hearing, see Sneed-Jacobs Dep. at 84-85, she argues that because it had not been typical for a faculty union representative to be present prior to her employment, Halbert's presence at the grade-appeal hearings she conducted was somehow indicative of discriminatory animus because it "did not occur with any of her white predecessors," Pls.' Br. at 17-19, 37. Even assuming that a faculty union representative had never previously attended such a hearing, Halbert's presence at these hearings does not demonstrate that Bastecki-Perez's decision to terminate her in February 2018 was a pretext for discrimination. Bastecki-Perez testified that the grade-appeal process conducted by Sneed-Jacobs was a "difficult process" and that "there was a lack of trust" between Sneed-Jacobs and Halbert. Bastecki-Perez Dep. at 150. Rather than dispute Bastecki-Perez's characterization of the process, however, Sneed-Jacobs acknowledges that "she was subject to complaints from faculty and the union representative of her handling of the grade[-]appeals process." Pls.' Br. at 37. Although she argues that the faculty complaints were unwarranted, she does not dispute that she did in fact receive complaints nor does she present evidence that Bastecki-Perez's belief that tension existed between her and the faculty was insincere. Instead, she merely claims that Halbert was "just very nasty about" their interactions regarding the grade-appeal process. Id. at 18 (quoting Sneed-Jacobs Dep. at 83). The interpersonal conflict that Sneed-Jacobs experienced with Halbert, however, does not create a genuine issue of fact that Bastecki-Perez's belief that Sneed-Jacobs was not having positive interactions with faculty members was a pretext for discrimination, particularly when she acknowledges that complaints were made about her

19

handling of the appeals process.  A plaintiff's subjective belief that race played a role in his or

her employment decisions is insufficient to establish pretext.  Brown v. Sch. Dist. of Phila., No.

17-2653, 2018 WL 4489646, at *7 (E.D. Pa. Sept. 19, 2018).

Sneed-Jacobs also alleges that it was her decision to attend the Black Conference on

Higher Education that was a factor in her termination.  Sneed-Jacobs' Facts ¶¶ 54, 56.  On

February 20, 2018, Sneed-Jacobs emailed Bastecki-Perez's assistant that she would be away

from campus on February 22 and 23, 2018, to attend the Black Conference on Higher Education,

as well as additional dates for conferences and vacation.  Doc. No. 37-22.  After being forwarded

the message from her assistant, Bastecki-Perez wrote Sneed-Jacobs that, moving forward, she

needed to see conference and vacation requests for her consideration in advance, particularly so

that she could review the agendas for the requested conferences prior to registration.[3]  Id.

Bastecki-Perez ultimately instructed Sneed-Jacobs to leave the conference to return to campus

and upon her return she was terminated.  Def.'s Sneed-Jacobs Facts ¶ 55.  Sneed-Jacobs testified

that Bastecki-Perez had in fact previously approved the conference, but "didn't seem to

remember that she had signed off on [] my attendance."  Sneed-Jacobs Dep. at 174-75; Pls.' Br.

at 21.  Viewing the facts in a light most favorable to Sneed-Jacobs and assuming that Bastecki-

Perez had previously authorized Sneed-Jacobs' attendance at the conference but subsequently

forgot, the summary judgment record reveals that Bastecki-Perez's decision to terminate her

---

[3]     Moreover, approximately one week prior, Sneed-Jacobs requested day-of approval to work
from home so that she could leave for a family obligation later that day.  Def.'s Sneed-Jacobs
Facts ¶ 46; Sneed-Jacobs' Facts ¶ 46.  In response to her email request,  Bastecki-Perez informed
Sneed-Jacobs that she wished that this request to work from home had been discussed in person
as there were students who would be dropping into the office that day who needed assistance and
other duties that required in-person attention.  Def.'s Sneed-Jacobs Facts ¶ 49; Sneed-Jacobs'
Facts ¶ 49.

after learning of her attendance at the conference was motivated by a sincere, albeit perhaps

mistaken, belief that Sneed-Jacobs attended the conference without receiving prior approval.

To the extent Sneed-Jacobs argues that the lack of any progressive discipline before her

termination demonstrates pretext, she fails to point to any record evidence indicating that MC3

had a policy of progressive discipline for administrators.  In fact, she acknowledges that although

progressive discipline was used for employees, there was no termination procedure for

administrators.  Pls.' Br. at 20.  Regardless, "[w]hether she was told previously [of complaints

regarding her job performance] is irrelevant" in establishing pretext.  Nyamekye v. Penn Hills

Sch. Dist., No. 2:15cv1219, 2017 WL 4023352, at *5 (W.D. Pa. Sept. 13, 2017).

Finally, Sneed-Jacobs also emphasizes that Makofske told her that she was a "test case,"

explaining that MC3 was "having a problem hiring candidates of color" and that Makofske "did

not understand why they weren't being selected . . . because they became finalists and they had

the interview that brought them to campus, [but] they were not the selected candidates."  Sneed-

Jacobs Dep. at 36-37.  According to Sneed-Jacobs, Makofske explained that "she felt like in

order for her to understand why, she needed to be in the room" and, therefore, participated in

Sneed-Jacobs' interview as a "test case."  Id. at 37.  The fact that Makofske participated in

Sneed-Jacobs' interview process in an effort to facilitate the hiring of diverse candidates does not

demonstrate that Bastecki-Perez's decision to terminate her based on a variety of performance

issues "was either a post hoc fabrication or otherwise did not actually motivate the employment

action."  Fuentes, 32 F.3d at 764.  Indeed, "'when the person who made the decision to fire was

the same person who made the decision to hire, it is difficult to impute to [him or] her an

invidious motivation that would be inconsistent with the decision to hire.'"  Yue Yu v. McGrath,

No. CIV.A. 11-5446 PGS, 2014 WL 1276244, at *12 (D.N.J. Mar. 27, 2014), aff'd, 597 F.

App'x 62 (3d Cir. 2014) (quoting Grady v. Affiliated Cent., Inc., 130 F.3d 553, 560 (2d Cir.

1997)).  Accordingly, MC3 is entitled to summary judgment on Sneed-Jacobs' claim of

discrimination.[4]

### 2.   **Patterson**

Patterson claims that she was racially discriminated against when MC3 twice failed to

hire her for the position of Dean of Health Sciences.  Pls.' Second Am. Compl. ¶ 30.  The

elements of a race discrimination claim for failure to hire or promote are that: (1) the plaintiff

belongs to a protected class; (2) he or she applied for and was qualified for a job in an available

position; (3) despite his or her qualifications, he or she was not hired or promoted; and (4) after

he or she was rejected, the position stayed open, or was filled in a manner giving rise to an

inference of discrimination.  Bray v. Marriott Hotels, 110 F.3d 986, 990 (3d Cir. 1997); Olson v.

Gen. Elec. Astrospace, 101 F.3d 947, 951 (3d Cir. 1996).

Patterson first applied for the Dean of Health Sciences position in June 2016, when she

was an Assistant Professor of Public Health.  Def.'s Patterson Facts ¶ 14; Patterson's Facts ¶ 14.

---

[4]   To the extent Plaintiffs attempt to bring a claim regarding a pattern and practice of
discrimination, see Pls.' Second Am. Compl. ¶¶ 1, 37, 40, 55, individual plaintiffs may not plead
a "pattern or practice" of discrimination as a stand-alone claim.  Roberson v. Post Commercial
Real Estate LLC, No. 13-6730, 2015 WL 2118158, at *3 (E.D. Pa. May 1, 2015).  Here,
Plaintiffs reference a handful of anecdotal accounts of various individuals' hiring, promotion,
and other experiences at MC3.  See Pls.' Br. at 24-25.  Although "'[s]tatistical evidence of an
employer's pattern and practice with respect to minority employment may be relevant to a
showing of pretext,' . . . such evidence must be accompanied by some 'analysis of either the
qualified applicant pool or the flow of qualified candidates over a relevant time period' to have
probative value." Peake v. Pa. State Police, No. 12-1761, 2015 WL 3646446, at *8 (W.D. Pa.
June 10, 2015) (quoting Ezold, 983 F.2d at 542-43).  Plaintiffs' anecdotal assertions of allegedly
unfavorable treatment, without the benefit of any analysis, are not sufficiently probative to create
a genuine issue of fact regarding pretext.

With respect to her 2016 application for the Dean of Health Sciences position, Patterson and Gillard were the only two candidates that advanced in the initial search-selection process.  Def.'s Patterson Facts ¶ 15; Patterson's Facts ¶ 15.  MC3 ultimately hired Gillard, who is white, for the position.  Def.'s Patterson Facts ¶¶ 17-18, 24; Patterson's Facts ¶¶ 17-18, 24.

Assuming for the purposes of summary judgment that Patterson has established a prima facie case of discrimination, see Johnson, 214 F. App'x at 242 (holding replacing plaintiff with someone outside of the protected class establishes fourth element of prima facie case), MC3 put forward legitimate, nondiscriminatory reasons for its selection of Gillard over Patterson.  Specifically, Bastecki-Perez, the hiring manager, testified that Gillard was selected for the position over Patterson based on her professional background and experience, explaining that:

> [Gillard] [h]ad an earned doctorate, she had more than 20 years of experience in higher education, both as a full-time faculty member and as an administrator.  She had demonstrated program development skill, grant acquisition and management.  She was a curricular consultant for an accrediting body.  She had professional organization, membership, leadership roles, a fellowship.  She also was actively involved in clinical practice . . . . Dr. Gillard also had experience with special program accreditation at the associate and baccalaureate degrees, she had professional organization membership, leadership and a fellowship.

Bastecki-Perez Dep. at 153-55.  Patterson does not dispute that Gillard had these qualifications,[5] nor does she claim that her qualifications were superior to Gillard's.  Patterson's Facts ¶ 19.  For example, Patterson did not possess a doctorate degree at the time she applied for this position.  Def.'s Patterson Facts ¶ 41; Patterson's Facts ¶ 41.  Consequently, in light of Gillard's undisputed credentials, MC3 has more than met its burden to articulate a legitimate,

---

[5]   Patterson does not dispute that Gillard had the specific professional background and experience identified in Bastecki-Perez's deposition testimony, but rather disputes that MC3's rationale for hiring Gillard over Patterson is a "material fact."  Patterson's Facts ¶ 19.  MC3's ability to articulate a legitimate, nondiscriminatory reason for hiring Gillard over Patterson, however, is a critical aspect of the burden-shifting framework necessary to establish a claim of

(Footnote continued on next page)

nondiscriminatory reason for its decision to hire Gillard over Patterson for this position.  See

Lucas v. Cnty. of Allegheny, Pa., No. 2:05cvl760, 2007 WL 2752143, at *7 (W.D. Pa. Sept. 19,

2007).  The burden thus falls upon Patterson to "demonstrate that the employer's proffered

reasons were merely a pretext for intentional discrimination."  Paradisi v. Englewood Hosp.

Med. Ctr., 680 F. App'x 131, 136 (3d Cir. 2017) (citing McDonnell Douglas, 411 U.S. at 804).

　　　　Patterson argues that pretext can be established with respect to the 2016 Dean search

because "[t]here are significant fundamental disputes regarding Dr. Patterson's qualifications, the

reasons for not promoting her to Dean of Health Sciences, [and] the qualifications of Dr.

Gillard."  Pls.' Br. at 41.  To the extent that Patterson maintains that her qualifications made her

a superior candidate to Gillard, "[i]t is not this court's role to second-guess an employer's

business judgment as to who is more qualified for the job."  Dungee v. Ne. Foods, Inc., 940 F.

Supp. 682, 689 (D.N.J. 1996).  "'[M]ore than a denial of promotion as a result of a dispute over

qualifications must be shown to prove pretext.'"  Steele v. Pelmor Labs. Inc., 642 F. App'x 129,

135 (3d Cir. 2016) (quoting Bennun v. Rutgers State Univ., 941 F.2d 154, 170 (3d Cir. 1991)).

Instead, a plaintiff must show "'that the qualifications of the person actually promoted were *so*

*much lower* than those of h[is] [or her] competitors that a reasonable factfinder could disbelieve

the claim that the employer was honestly seeking the best qualified candidate.'"  Id. (quoting

Bray, 110 F.3d at 999 (Alito, J. dissenting) (emphasis in original)).  Patterson has simply failed

to show that the differences in qualifications between herself and Gillard were "so disparate that

a reasonable factfinder could rationally conclude that [Patterson] was clearly a better candidate

---

discrimination.  See McDonnell Douglas, 411 U.S. at 802-03.

for the job" and that discrimination was the real reason for MC3's decision to hire Gillard.[6]
Waris v. Heartland Home Healthcare Servs., Inc., 365 F. App'x 402, 405 (3d Cir. 2010).

Patterson maintains that the hiring process during MC3's 2018 search for the Dean of Health Sciences position was likewise discriminatory.  Pls.' Br. at 36.  While serving as Interim Dean, Patterson applied for the position of Dean of Health Sciences once again in February 2018.  Def.'s Patterson Facts ¶ 30; Patterson's Facts ¶ 30.  MC3 ultimately hired Oikelome, who is Black or African American, for the position in July 2018.  Def.'s Patterson Facts ¶¶ 31, 33; Patterson's Facts ¶¶ 31, 33.  Patterson argues that Oikelome, who originally applied and was interviewed for the Assistant Vice President of Academic Affairs position in May 2018, withdrew her application for that position and applied for Dean of Health Sciences in June 2018, three months after the application date for the job closed.  Patterson's Facts ¶ 31.  Therefore, she claims she was "wrongfully denied a full opportunity to compete" for the position.  Id.

Patterson has not produced sufficient evidence to suggest an inference of discrimination necessary to establish a prima facie case of discrimination with respect to her application for the position in 2018.  As an initial matter, unlike the 2016 Dean search, here Patterson is unable to demonstrate that the position was filled by someone outside the protected class.  See, e.g., Johnson, 214 F. App'x at 242; Bernard v. K&D Factory Serv., Inc., No. 3:15-CV-01802, 2018 WL 338606, at *4 (M.D. Pa. Jan. 9, 2018).  Oikelome, the candidate that was selected for the

---

[6]   Patterson also appears to allege that Gillard's poor performance as Dean, which led to her termination, somehow demonstrates that the decision not to hire her in 2016 was pretextual.  See, e.g., Pls.' Br. at 14, 35.  A candidate's ultimate success or failure in the position, however, does not demonstrate that the initial decision to hire him or her was not motivated by his or her qualifications at the time he or she applied for the position.  Thus, that Gillard proved to be unsuccessful in the position, despite her undisputed qualifications when applying, does not create a genuine issue of material fact that MC3's decision to hire her was a pretext for discrimination.

position, identified as Black or African American.  Def.'s Patterson Facts ¶ 33; Patterson's Facts ¶ 33.  While not dispositive, "an employer's favorable treatment of other members of a protected class can create an inference that the employer lacks discriminatory intent."  Ansell v. Green Acres Contracting Co., 347 F.3d 515, 524 (3d Cir. 2003); see also Nardella v. Phila. Gas Works, 621 F. App'x 105, 108 (3d Cir. 2015); Boice v. Se. Pennsylvania Transp. Auth., No. CIV.A 05-4772, 2007 WL 2916188, at *11 (E.D. Pa. Oct. 5, 2007).  Nor has she adduced other evidence that would otherwise suggest that MC3's decision to not hire her to the permanent Dean position, but offer her a reappointment of her faculty position, see Def.'s Patterson Facts ¶¶ 35-36; Patterson's Facts ¶¶ 35-36, was motivated by discriminatory animus.  As a result, MC3 is entitled to summary judgment on Patterson's claim of discrimination.

### 3.  Henderson

Henderson claims that she was discriminated against during her employment at MC3 based on the purportedly unfair administration of her vacation, sick, and FMLA leave as well as the allegedly racially discriminatory behavior she encountered with her colleagues.  Pls.' Second Am. Compl. ¶¶ 16-25.  MC3 argues that Henderson's failure to identify an adverse employment action, however, is fatal to her claim of discrimination.  Def.'s Br. in Support of Mot. for Summ. J. Against Henderson (Doc. No. 32-2) at 10-13.  In response, Henderson maintains that she experienced an adverse employment action when she was allegedly "forced to resign" in July 2020.  Pls.' Br. at 2, 35.

Voluntary resignation is not an adverse employment action.  Larochelle v. Wilmac Corp., 769 F. App'x 57, 60 (3d Cir. 2019).  A resignation can constitute an adverse employment action if it rises to the level of a "constructive discharge."  Jones v. McCormick & Schmick's Seafood Rests., Inc., No. 1:12-cv-04503, 2014 WL 1669808, at *4 (D.N.J. Apr. 28, 2014).  The Supreme

Court has described a constructive discharge as "an employee's reasonable decision to resign because of unendurable working conditions . . . . The inquiry is objective: Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?" Pa. State Police v. Suders, 529 U.S. 129, 141 (2004).  "Intolerability is not established by showing merely that a reasonable person, confronted with the same choices as the employee, would have viewed resignation as the wisest choice or best decision, or even that the employee subjectively felt compelled to resign; presumably every resignation occurs because the employee believes that it is in his [or her] best interest to resign." Connors v. Chrysler Fin. Corp., 160 F.3d 971, 976 (3d Cir. 1998) (internal quotation marks omitted). Instead, "[i]ntolerability . . . is assessed by the objective standard of whether a reasonable person in the employee's position would have felt compelled to resign,– that is, whether he [or she] would have had no choice but to resign." Id. (emphasis in original) (internal quotation marks omitted).  In evaluating whether the employer permitted conditions so unpleasant or difficult that a reasonable person would have felt compelled to resign, the Third Circuit has instructed courts to consider whether the employer: (1) threatened the employee with discharge or urged or suggested that he or she resign or retire; (2) demoted him or her; (3) reduced his or her pay or benefits; (4) involuntarily transferred him or her to a less desirable position; (5) altered his or her job responsibilities; or (6) gave unsatisfactory job evaluations.  See Colwell v. Rite Aid Corp., 602 F.3d 495, 502-03 (3d Cir. 2010).  To succeed on a claim premised on constructive discharge, Henderson "must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment." Spencer v. Wal-Mart Stores, Inc., 469 F.3d 311, 317 n.4 (3d Cir. 2006) (internal quotation marks omitted).  Here, for the same reasons that Henderson has failed to substantiate an actionable hostile work environment claim,

as discussed <u>infra</u> in Section III.B.3, she also fails to meet the more stringent requirements of a hostile environment constructive discharge claim.

Henderson fails to create a genuine issue of fact that her resignation amounted to a constructive discharge.  None of the factors identified by the Third Circuit are present here: Henderson was not threatened with discharge, urged or suggested to resign or retire, demoted, involuntarily transferred, given unsatisfactory evaluations, or had her pay or benefits reduced or job responsibilities altered.  <u>See</u> <u>Colwell</u>, 602 F.3d at 502-03.  Nor do the facts in the record otherwise support Henderson's claim that the working environment at MC3 was so unbearable that resignation was her only choice.

Henderson argues that the following conditions purportedly led to her resignation: (1) she was routinely marginalized and undermined by white supervisors and colleagues; (2) her FMLA leave was unfairly administered; (3) she endured unfounded complaints from faculty about her race; and (4) she was referred to as a "quota hire" by Halbert.  Pls.' Br. at 34-35.  With respect to her FMLA leave, Henderson contends that her FMLA leave was unfairly administered because O'Connor allegedly told her that MC3 administrators had unlimited medical leave, then subsequently told her that she had 12 weeks of FMLA leave for which she would receive her full salary.  <u>Id.</u> at 4.  Even assuming that O'Connor informed her the administrators received unlimited leave, MC3 maintained a policy governing family and medical leave pursuant to the FMLA and for administrative leave for full-time administrators, neither of which had a provision granting unlimited medical leave.  O'Connor Dep. Ex. 8.  Henderson fails to offer any evidence in the summary judgment record of other administrators who were granted unlimited medical leave, or that she was denied this alleged benefit on account of her race.  **Def.'s Henderson Facts ¶ 26; Henderson's Facts ¶ 26.**

Moreover, Henderson was consistently granted and compensated for all available paid leave under MC3 policies.[7]  See, e.g., Def.'s Henderson Facts ¶¶ 53, 56, 57, 63.  To the extent she claims that MC3 made errors in calculating the amount of leave to which she was allowed and her corresponding compensation, see Pls.' Br. at 4-6, she fails to provide any evidence that these errors were in any way intentional as opposed to an administrative oversight or that discriminatory animus was a factor behind such a mistake.  Indeed, Henderson admits that despite any discrepancies in the initial calculations involving her leave and compensation, she was ultimately compensated fully.  Henderson's Facts ¶¶ 35, 37; Henderson Dep. (Doc. No. 31-1) at 61, 78.  Henderson likewise argues that she "felt" that "remain[ing] in close contact with O'Connor and Connie Barnes . . . was discrimination and was not aware of anyone else who had to jump through so many hurdles to be on leave."  Pls.' Br. at 5.  The fact that Henderson was inaccurately advised regarding her leave, that her hours and leave used had been miscalculated – but then eventually rectified and fully compensated – and that she was requested to submit various paperwork from healthcare providers to support her multiple requests for leave in no way amount to an "intolerable" working environment supporting her claim that she was constructively discharged.  See, e.g., Alotto v. ECSM Util. Contractors, Inc., No. 09-1144, 2010 WL 5186127, at *3 (D.N.J. Dec. 15, 2010) (holding that no reasonable factfinder could conclude that employer's request for a doctor's note indicating that employee could perform the requirements of her job could support claim of constructive discharge).  Henderson requested and had approved multiple requests for leave throughout her employment related to the care of her own medical needs and that of her family, and used the entirety of the 450 hours of family

---

[7]   Notably, Henderson does not bring a claim of retaliation or interference in connection with

(Footnote continued on next page)

and medical leave available.  Def.'s Henderson Facts ¶ 63; Henderson's Facts ¶ 63.  Henderson

provides no support for her claim that purported miscalculations of her leave and pay were

intentional or racially motivated, and "the law does not permit an employee's subjective

perceptions to govern a claim of constructive discharge."  Clowes v. Allegheny Valley Hosp.,

991 F.2d 1159, 1162 (3d Cir. 1993) (internal quotation marks omitted).

Henderson also relies on her interactions with Halbert, particularly his use of the term

"quota hire," as creating the allegedly toxic environment that led to her resignation.  Pls.' Br. at

34-35.  In particular, in August 2018, Henderson and Halbert exchanged emails relating to a

disagreement over whether Halbert was required to copy Henderson on an email regarding a

faculty issue.  Def.'s Henderson Facts ¶ 67; Halbert Dep. Ex. 6.  Henderson accused Halbert of

taking an "aggressive and bullying" tone in his email to her, although the email contained no

overtly discriminatory or disparaging comments.  Henderson Dep. at 82-89; Halbert Dep. Ex. 6.

In response to Henderson's accusations of bullying, Halbert sought both an investigation as well

as an apology from her.  Halbert Dep. Ex. 6.  That same day, Henderson submitted a

discrimination complaint to O'Connor.  Def.'s Henderson Facts ¶¶ 4, 69-70; Henderson's Facts

¶¶ 4, 69-70; O'Connor Dep. Ex. 4.  To address the dispute, a meeting was held in September

2018 between Halbert and Henderson, during which Halbert referred to Henderson as a "quota

hire."  Def.'s Henderson Facts ¶ 71; Henderson's Facts ¶ 71.  Although Henderson claims that

Halbert used this term on "multiple occasions," Pls.' Br. at 34, she does not identify any occasion

other than during the September 2018 meeting in which this was said to her.  Viewing the facts

in a light most favorable to Henderson, even if Halbert directly called Henderson a "quota hire"

---

the exercise of her rights pursuant to the FMLA.

and had done so on more than one occasion, Henderson still fails to establish that these comments created conditions so intolerable that a reasonable person in her position would feel compelled to resign.  See, e.g., Caver v. City of Trenton, 420 F.3d 243, 262 (3d Cir. 2005) ("'[O]ffhanded comments, and isolated incidents (unless extremely serious)' are not sufficient to sustain a hostile work environment claim." (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998))).  Although Henderson had reason to be upset by Halbert's insensitive, offensive comment and expect that this would be addressed by her supervisors, her interactions with Halbert do not rise to the level of a "continuous pattern of harassment" or amount to a condition "so unpleasant or difficult" that a reasonable employee would have been left with no choice but to resign.  Duffy v. Paper Magic Grp., Inc., 265 F.3d 163, 167-68 (3d Cir. 2001) (internal quotation marks omitted); cf. Kidd v. MBNA Am. Bank, N.A., 93 F. App'x 399, 402 (3d Cir. 2004) ("[Plaintiff] presents evidence that a male co-worker made several disparaging remarks to her which referenced her national origin and that he made other threatening comments including references to a gun.  The comments were certainly obnoxious and had no place in the work environment.  However, these comments by a single co[-]worker do not establish that discrimination was pervasive and regular.").

Indeed, Halbert's reference to Henderson as a quota hire in September 2018 is the last allegation Henderson makes with regard to her contentious interactions with Halbert.  While Halbert's comments may be viewed as discomforting, they are far too remote from Henderson's date of resignation to establish her claim of constructive discharge.  Henderson continued to work in her role for almost two years after the last reported hostile interaction with Halbert until her resignation in July 2020, undermining her argument that she had no choice but to resign in

light of his allegedly discriminatory conduct against her.  See DeGroat v. DeFebo, 87 F. Supp.

3d 706, 736 (M.D. Pa. 2015).

Henderson's allegations that she was not included in meetings, that subordinates would

bypass her when raising concerns, that subordinates would be selected over her to attend

conferences, and that her actions regarding certain faculty teaching courses were "second-

guessed," see Pls.' Br. at 2-4, even if true, amount to little more than workplace grievances.  The

Third Circuit has held that "it is clear that unfair and unwarranted treatment is by no means the

same as constructive discharge."  Clowes, 991 F.2d at 1160-62 (situations in which an

employee's supervisor spoke to the employee in a "demeaning, condescending manner,"

criticized the employee in public; "overzealous[ly]" supervised the employee's work, lodged

criticisms of the employee that were not "entirely warranted" do not amount to constructive

discharge); see also Duffy, 265 F.3d at 169 (exclusion from committees, hiring decisions, staff

meetings, and seminars does not "render a job so unbearable that [employee] was forced to

resign"); Cubbage v. Bloomberg, L.P., No. 05-2989, 2010 WL 3488619, at *13 (E.D. Pa. Aug.

31, 2010) (holding that supervisors criticizing performance repeatedly, assigning plaintiff to

menial work, declining attendance at requested conferences, and criticizing telephone, internet

and lunch break habits and being subjected to inappropriate comments from coworkers were

"insufficient to show that a reasonable person would have found [the] treatment severe or

pervasive enough" for a hostile work environment claim).

Henderson also contends that she was subjected to a single comment from another

coworker that she believed was racially coded regarding a scent being used by massage

therapists who were African American.  Pls.' Br. at 3; Doc. No. 37-3.  Although Henderson

claims that she believes the reference by a coworker to "those people" "felt like racism," Pls.'

Br. at 3, this statement is clearly subject to a non-racial interpretation.  Even to the extent that

this comment was racist in nature, it does not amount to conditions so severe that it would

support her claim of constructive discharge.  Barbosa v. Tribune Co., No. 01-CV-1262, 2003 WL

22238984, at *3 (E.D. Pa. Sept. 25, 2003) (three specific racist remarks, negative weekly

evaluations not directly linked to a discriminatory motive, and conclusory allegations of

discrimination were insufficiently severe to withstand summary judgment on hostile work

environment claim).

      Here, "no reasonable finder of fact asked to consider the litany of real or perceived slights

suffered by [Henderson] . . . could conclude that [she] suffered under conditions that could be

objectively described as being so intolerable that [she] had no [re]course but to quit."  Lebofsky

v. City of Phila., 394 F. App'x 935, 940 (3d Cir. 2010) (internal quotation marks omitted).

Having failed to establish that she suffered an adverse employment action, MC3 is entitled to

summary judgment on Henderson's claim of discrimination.

### B.    MC3 is Entitled to Summary Judgment on Sneed Jacobs', Patterson's, and Henderson's Hostile Work Environment Claims

      Plaintiffs assert that MC3 subjected them to a hostile work environment in violation of

Title VII.  Pls.' Second Am. Compl., Count II.  To establish a claim for a racially hostile work

environment, a plaintiff must show that: (1) he or she suffered intentional discrimination because

of his or her race; (2) the discrimination was severe or pervasive; (3) the discrimination

detrimentally affected the employee; (4) the discrimination would have detrimentally affected a

reasonable person in like circumstances; and (5) a basis for employer liability is present.

Castleberry v. STI Grp., 863 F.3d 259, 263 (3d Cir. 2017).  Where the harassment is by someone

other than a plaintiff's supervisor, then the plaintiff must also provide sufficient evidence that

"the employer failed to provide a reasonable avenue for complaint or, alternatively, [that the]

employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action." Huston v. Procter & Gamble Paper Prods. Corp., 568 F.3d 100, 104 (3d Cir. 2009).

The Third Circuit has explained that, in order to prove a hostile work environment claim, a plaintiff must show that his or her "workplace was 'permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the condition of [his or her] employment and create an abusive working environment.'" Peace-Wickham v. Walls, 409 F. App'x 512, 519 (3d Cir. 2010) (quoting Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 116 (2002)).  "The environment must be objectively hostile, not just hostile in the plaintiff's view." Greer v. Mondelez Global, Inc., 590 F. App'x 170, 173 (3d Cir. 2014).  The following factors are relevant in determining whether a plaintiff has made this showing: "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Peace-Wickham, 409 F. App'x at 519 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993)).  "'[O]ffhanded comments and isolated incidents (unless extremely serious) are not sufficient to sustain a hostile work environment claim.'" Id. (quoting Caver, 420 F.3d at 262).

## 1.    Sneed-Jacobs

Sneed-Jacobs points to a number of grievances during her four months of employment, none of which, individually or taken together, rise to the level of a hostile work environment.  As discussed supra in Section III.A.1, Sneed-Jacobs argues that the faculty union representative attended grade-appeals hearings, which had not occurred prior to her employment, Pls.' Br. at 17-19, 37; Halbert was "very nasty" when questioning her about the grade-appeal hearings

process, id. at 18; Halbert contacted campus security to be present outside the hearing, id. at 19; she was "set up to fail" in planning the Faculty Development Day by having her request for breakfast denied, her request for someone to give a workshop rejected, her recommended board game approved despite it resulting in faculty feeling "insulted," id. at 19-20; and she received "very ugly and . . . nasty . . . comments" that she "didn't deserve" from the faculty in their survey responses to the program, id. at 20.  "'Mere offensive utterances' are insufficient to create a hostile work environment, even if they engender offensive feelings in an employee."  Greer, 590 F. App'x at 173 (quoting Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 271 (2001)).  Even if all of the specific allegations to which Sneed-Jacobs points to are found to be true, no reasonable jury could find that such acts were so severe or pervasive to rise to the level of a legally actionable hostile workplace.  See, e.g., Ballard-Carter v. Vanguard Grp., 703 F. App'x 149, 152 (3d Cir. 2017) (finding four comments that "[a]t best . . . may be considered uncivil" were not "so severe as to alter the conditions of [plaintiff's] employment" nor frequent enough to "be considered pervasive").

### 2.     Patterson

Patterson argues that throughout her four years at MC3 she was subjected to a variety of microaggressions, including complaints about her clothing and hair, that presumably amounted to a hostile work environment.  Pls.' Br. at 45.  For example, Patterson claims that she met with Makofske because people had purportedly complained about her clothing or hair, but Patterson acknowledges that Makofske did not instruct her to do anything differently, id. at 13; Patterson claimed the faculty would be angry with her when she was the one to announce curriculum changes, id. at 15; and a colleague of Patterson's would come into her office and "rant and yell," and had similar outbursts with other African American or Caribbean colleagues, id. at 16.   Even

accepting the characterization of each of these encounters as true, there is no genuine dispute that, when viewed together, they in any way reached the level of severity that would interfere with her ability to perform her job duties or were so extreme as to amount to a change in the terms and conditions of her employment.  See, e.g., Clair v. Agusta Aerospace Corp., 592 F. Supp. 2d 812, 822 (E.D. Pa. 2009) (finding that five vague statements that did not "necessarily evidence a clear discriminatory intent" and were isolated over a 21-month span did not establish severe and pervasive discrimination).

### 3.    Henderson

As detailed supra in Section III.A.3, Henderson argues that Halbert referred to her as a "quota hire"; was "aggressive and bullying" in an email communication to her; told her that she was not liked because she was an African American woman; and second-guessed her actions regarding faculty course selections.  Pls.' Br. at 2-13.  Henderson further maintains that she was not included in meetings, subordinates would bypass her and raise concerns with the union instead; subordinates would be sent to conferences instead of Henderson; and an offhand comment was made regarding the scent coming from African American massage therapists, which Henderson interpreted to be racist.  Id.  Once again, even if all of the specific allegations to which Henderson points to are found to be true, no reasonable jury could find that such acts were so severe or pervasive to rise to the level of a legally actionable hostile workplace.  "The Supreme Court has been clear that a plaintiff must point to 'extreme' conduct to support an actionable hostile work environment claim; 'offhand comments,' 'isolated incidents,' and 'mere utterance[s] of an ethnic or racial epithet which engenders offensive feelings in an employee' do not suffice."  Abuomar v. Dep't of Corrs., 754 F. App'x 102, 107 (3d Cir. 2018) (quoting Faragher, 524 U.S. at 787-88 (alteration supplied by Abuomar).  Granting Henderson every

benefit of the doubt, these "incidents . . . lack the intentionality, severity, pervasiveness, or detrimental [e]ffect on a reasonable person such as to satisfy" a claim for a hostile work environment.  Cubbage, 2010 WL 3488619, at *14; see also Barbosa, 2003 WL 22238984, at *3; Kidd, 93 F. App'x at 402.

C.      **MC3 is Entitled to Summary Judgment on Plaintiffs' Retaliation Claims**

MC3 argues that it is entitled to summary judgment on Plaintiffs' retaliation claims.  To establish a prima facie case of retaliation under Title VII, § 1981, and the PHRA, a plaintiff must show that: (1) he or she engaged in protected activity; (2) the employer took an adverse employment action against him or her; and (3) there was a causal connection between his or her participation in the protected activity and the adverse employment action.  Moore v. City of Phila., 461 F.3d 331, 340-41 (3d Cir. 2006); Brennan v. City of Philadelphia, No. 18-1417, 2020 WL 3574454, at *7 (E.D. Pa. June 30, 2020).  To qualify as an adverse employment action, retaliatory conduct must be such that it "'might well have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  Moore, 461 F.3d at 341 (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67 (2006)).  The third element of the test requires proof of "but-for" causation.  Univ. of Texas Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 360 (2013). "This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."  Id.

1.      **Sneed-Jacobs**

Sneed-Jacobs cannot succeed on her retaliation claim because she fails to identify any protected activity in which she engaged while employed at MC3.  To establish a prima facie case of retaliation, Sneed-Jacobs was required to show, among other things, that she engaged in protected activity.  See Moore, 461 F.3d at 340-41.  Protected activities include making formal

charges of discrimination against an employer.  See Boykins v. SEPTA, 722 F. App'x 148, 157

(3d Cir. 2018).  A plaintiff can also point to informal protests of discriminatory employment

practices, which include complaints made to upper management.  Kramer v. Franklin Covey Co.,

No. 2:18-cv-1599, 2021 WL 462344, at *10 (W.D. Pa. Feb. 9, 2021).  Here, however, Sneed-

Jacobs does not identify any protected activity with which she was engaged during her time at

MC3.  Indeed, Sneed-Jacobs testified that she never made a complaint of discrimination on the

basis of race while she was employed at MC3.  Sneed-Jacobs Dep. at 51-52.  Although Plaintiffs

argue that they "all engaged in protected activity by reporting the discriminatory and retaliatory

conduct to their supervisors and human resources throughout their employment," Pls.' Br. at 32,

Sneed-Jacobs fails to identify even one instance in which she made any reports or complaints.

Accordingly, MC3 is entitled to summary judgment on Sneed-Jacobs' claim of retaliation.

### 2.   **Patterson**

MC3 contends that Patterson has failed to put forth evidence that she was engaged in

protected activity or that MC3's decision not to promote her to the permanent Dean of Health

Sciences position was in retaliation for that protected activity.  Def.'s Br. in Support of Mot. for

Summ. J. Against Patterson (Doc. No. 30-2) at 12-13.  In response, Patterson argues that she

raised concerns to Makofske and Adrien Hobdy ("Hobdy") in Human Resources about the

alleged microaggressions she experienced.  Pls.' Br. at 15-16.

Assuming for purposes of summary judgment that Patterson's complaints to Makofske

and Hobdy qualify as protected conduct, Patterson fails to adduce any evidence that the decision

not to promote her after her 2016 or 2018 applications for the Dean of Health Sciences position

was in retaliation for making those complaints.  In order to establish a prima facie case of

retaliation, Patterson is required to present evidence that "there was a causal connection between

her participation in the protected activity and the adverse employment action." Moore, 461 F.3d at 340-41 (internal quotation marks omitted).  Absent direct evidence, a plaintiff may establish the requisite causal connection by proving "either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." Lauren W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007).  Here, Patterson fails to provide any factual details regarding when she made complaints to either Makofske or Hobdy.  Absent any information about the temporal separation between the protected conduct and the alleged retaliatory actions, a jury would be unable to infer a causal connection between the two.  Moreover, Patterson fails to set forth any additional evidence that the decision not to promote her to the permanent Dean position was in response to her complaints.  Therefore, Patterson fails to establish a prima facie case of retaliation and MC3 is entitled to summary judgment on this claim.

### 3.     Henderson

Henderson's claim for retaliation fails for the same reasons her discrimination claim lacks merit.  As discussed supra in Section III.A.3, no reasonable juror could find she suffered an adverse employment action.  As a result, Henderson fails to establish a prima facie case of retaliation and MC3 is entitled to summary judgment on this claim.

## IV.     CONCLUSION

For the reasons discussed above, Plaintiffs Sneed-Jacobs, Patterson, and Henderson have failed to raise a genuine issue of material fact regarding whether they can meet their evidentiary burden to establish either racial discrimination, a hostile work environment, or retaliation and consequently, MC3 is entitled to summary judgment.  An appropriate Order follows.

Dated: July 21, 2021

BY THE COURT:


*/s/ Marilyn Heffley*
MARILYN HEFFLEY
UNITED STATES MAGISTRATE JUDGE